IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JANET DITTMAN,  )
          Plaintiff,  )
           )
    v.  )    Civil Action No. 07-1652
           )
MICHAEL J. ASTRUE,  )    Magistrate Judge Lisa Pupo Lenihan
COMMISSIONER OF SOCIAL  )
SECURITY,  )
          Defendant.  )

## OPINION AND ORDER

**I.    CONCLUSION**

    Presently before the Court for disposition are cross motions for summary judgment. The Court concludes that substantial evidence supports the ALJ's challenged finding that, despite some mental health impediments, Plaintiff retained the ability to perform limited categories of unskilled light work.[1] Accordingly, the Plaintiff's Motion for Summary Judgement will be denied, the Defendant's Motion for Summary Judgment be granted, and the decision of the Commissioner of Social Security to deny Plaintiff's application will be affirmed.

---

1. As Defendant notes, Plaintiff challenges only the mental health aspect of the ALJ's Decision. See Defendant's Brief in Support at 7; Plaintiff's Brief in Support at pp. 14-20.

## II. CASE SUMMATION

### A. Procedural History

Janet Dittman ("Plaintiff"), by her counsel, timely filed a Complaint pursuant to the Social Security Act, as amended (the "Act"), for review of the Commissioner's final determination disallowing her claim for benefits (*i.e.* supplemental security income or "SSI") under the Act. The procedural history in this matter is as follows:

Plaintiff applied for SSI in May, 2004, alleging disability as of November 25, 2003 owing to anxiety and depression.[2] The State Agency denied her claim in a decision dated October 13, 2004 and she timely requested an administrative hearing, which was held before the Administrative Law Judge (the "ALJ") on October 16, 2006. Plaintiff was represented by counsel and a vocational expert testified. At Plaintiff's request, the record was held open for thirty (30) days and a consultative report obtained from Dr. Fernan was provided by Plaintiff's counsel in early November. On March 12, 2007, the ALJ issued his decision, finding that Plaintiff retained the ability to perform a limited range of unskilled, light work.

The ALJ concluded that Plaintiff (1) was not performing any substantial gainful activity; (2) had the severe impairments of depression and back pain; (3) suffered physical problems "clearly secondary to her mental health problems"; and (4) was not "disabled" within the Act as her medical history documented no "mental health treatment regimen" and otherwise did not support such finding. See Decision at 3-7.

---

2. Plaintiff, who is approximately 48 years of age, has never been employed. See Plaintiff's Brief in Support at 2.

The ALJ went on to conclude that, although Plaintiff had no relevant past work, she had the residual functional capacity ("RFC") to perform a limited range of light work, including representative jobs identified by the Vocational Expert (the "VE"),[3] and accordingly denied her application. The Appeals Counsel denied Plaintiff's request for reconsideration,[4] and this appeal timely followed.

In her Brief in Support of Motion for Summary Judgment, Plaintiff asserts that the ALJ erred in failing to award Plaintiff benefits on the basis of mental health disability. More particularly, Plaintiff alleges that the ALJ (1) erred in failing to find severe impairment by anxiety and/or cognitive intelligence;[5] (2) mischaracterized/misinterpreted Dr. Fernan's (a) testing as of questionable validity and (b) report as contrary to Plaintiff's medical history; (3) erred in relying on the findings of the Agency's consultative psychologist, Dr. Mercatoris; (4) mischaracterized Plaintiff's report of the extent of her mental health problems and treatment[6] and erroneously concluded that Plaintiff was only diagnosed with depression, was only prescribed

---

3. The limiting criteria identified by the ALJ included, *e.g.*, light work activity not involving heights, simple and repetitive tasks in routine work setting with routine work processes, only simple reading and writing requirements, no team work or interaction with public, and no high stressors (such as by quotas or production standards). See Plaintiff's Brief at 13.

4. The Appeals Counsel's decision was first dated August 17, 2007, but that decision was set aside to consider evidence of medical records from Summer 2007 submitted by Plaintiff's counsel in early August. Ultimately, the Counsel again found no basis for amendment of the ALJ's Decision.

5. Later, related objections are that the ALJ failed to properly assess whether Plaintiff's mental impairment met a listing, see id. at 15, item IV, and failed to analyze her symptoms from a "mental health view point", id., item VI (a).

6. A later, related objection is that the ALJ mischaracterized her activities of daily living. See id., item VI.

Seroquel, and was never "prescribed or treated" by a mental health professional; and (5) erred in his finding of residual capacity.

### B. Statement of Facts

Plaintiff was approximately 46 years of age at the time of the Hearing.[7] She has completed sixth or seventh grade, failed her attempts to obtain a GED, and appears to have no past work experience.[8] She resides with and provides domestic care for (a) her husband (a long-distance truck driver);[9] (b) a daughter in her early twenties who has learning disabilities, is unemployed, and receiving SSI; and (c) pets. See Record at 79 (noting that Plaintiff is representative payee for her daughter's SSI payments), 90-95 (Plaintiff's benefit application, indicating that she does the cleaning, laundry, shopping, food preparation, bill paying, keeps a vegetable garden, paints, and drives a car), 559.[10]

Plaintiff's medical records of the time relevant to this claim, *i.e.* November 2003 through March 2007, indicate multiple emergency room visits, brief hospitalizations (*e.g.* overnight), and some office visits for physical complaints of largely indeterminate origin. The attending physicians repeatedly note diagnosis of anxiety and/or depression on, *e.g.*, Plaintiff's emergency room discharge summaries. More particularly:

---

7. Plaintiff is therefore considered a "younger person" under the Commissioner's regulations. See 20 C.F.R. § 416.963(b).

8. See R. at 84 (disability application indicating Plaintiff has never worked).

9. See R. at 428.

10. For a period, she was also apparently caring for a grandchild. See R. at 512 (Plaintiff's reporting that she lived with husband, daughter and granddaughter).

(1) From January through April, 2004, Plaintiff presented to UPMC on multiple occasions with varying complaints of headache, lightheadedness and unsteadiness, weakness and fatigue, chest pains and palpitations, neck, facial and ear pain, leg pain, numbness and tingling. Her diagnoses on these occasions included reiterations of her symptoms, migraine, insomnia, pulmonary disease,[11] myalgia, sinusitis, urinary tract infection, family/domestic stress,[12] anxiety and/or depression, failure to take medications as prescribed, and hypochondria. See, *e.g.*, R. at 134 (Discharge summary of March 12, 2004, listing nine diagnoses at discharge, last of which was mental health-related diagnosis of "anxiety and insomnia"). She was repeatedly prescribed Aspirin, Ativan and, on at least one occasion, Zanax. See Plaintiff's Brief in Support at 3-4; 17 (stating that Plaintiff had 14 visits to the UPMC emergency room in 2004). See generally R. at 117-119 (UPMC 02/29/04), 134-135 (03/12/04), 142-146 (03/9/04), 179 (03/22/04), 248-252 (04/17/04). During this time, she was seen by Dr. Gent at UPMC, to whom Plaintiff complained of chest pain, radiating neck pain, insomnia, tingling, and anxiety. He similarly diagnosed "stress at home", pulmonary disease related to smoking, anxiety/depression and prescribed medications including Aspirin, Ativan and Nitroglycerin. See id. at 4; 17 (noting two visits to Dr. Gent); R. at 117 (Discharge summary of February 19, 2004).

(2) During March through May, 2004, Plaintiff was also reporting to the Clarion Hospital (and its emergency room) for treatment with similar complaints and diagnoses. She was

---

11. The records indicate that Plaintiff is a heavy smoker (*e.g.*, two packs per day) and began smoking in her twenties.

12. The records suggest that Plaintiff has been a victim of domestic violence. See *e.g.*, R. at 352-59 (Clarion Hospital notes of bruising on arms and legs at "various stages of healing", notes that Plaintiff "states husband made bruises on arms", and "domestic violence situation" but patient "declined counseling for issues at home").

5

prescribed Lorazepam, Ativan and Vistaril. These records also indicate she was taking Seroquel, Risperdal, and Lexapro. See id. at 5; 17 (noting five visits to Clarion Hospital in 2004); R. at 344, 350-59.

(3) In April and May, 2004, Plaintiff was twice seen by Dr. Hassan, of UPMC, a rheumatology consultant; after review of her physical complaints, he diagnosed mild fibromyalgia with depression. See id.; R. at 220-21, 297-98.[13]

(4) On May 21, 2004 - and, from the record, only on that date - Plaintiff was seen by Dr. Patel of UPMC for psychiatric care. See R. at 350, brief handwritten notes of Dr. Patel.[14]

(5) During the overlapping time period of April through June 3, 2004, Plaintiff also presented for treatment at the Houston Family Practice Clinic with similar physical complaints (numbness, chest pain and palpitations, lightheadedness, shortness of breath) and diagnosis (anxiety and/or depression, somatization). Id. at 5; 17 (noting six visits to this clinic in 2004).

As Plaintiff notes, the numerous diagnostic hospital testings performed - principally between January and May, 2004 - were essentially negative. See id. at 6. Plaintiff applied for disability in May, 2004.

---

13. Dr. Hassan notes that although Plaintiff "gave a history of psychiatric disorders" and indicated she'd "been hospitalized [in early April] for psychiatric symptoms", he found no records available at UPMC. See R. at 220. See also R. at 512 (Dr. Fernan's recount of Plaintiff's reporting admission to the Oil City Psychiatric Annex and follow-up for months with a psychiatrist in Oil City).

14. Although Plaintiff's Brief in Support refers to a "litany of treating and consulting mental health evidence", see Brief in Support at 17, this Court has carefully reviewed the medical record for the relevant period and finds it to contain extensive physical health complaints with diagnoses by those (frequently emergency room) providers of a mental health component. It has found, however, very little in the record by way of mental health professional services/treatment.

(6) Other than a consultative psychological exam arranged by the State Agency with Dr. Mercatoris in August, 2004, there is a lull in the medical records from June 3 through December 2004. Dr. Mercatoris observed Plaintiff's tidy appearance; with good eye contact, motor behavior and affective behavior; fluent and goal-directed thought and verbal processes; impaired abstract thinking abilities and limited intellectual ability; intact memory; fair social judgment; and ability to manage her daily living. He diagnosed generalized anxiety/panic disorder and limited, "borderline" intellectual ability.[15] He concluded that Plaintiff was mildly or moderately limited in some work related cognitive, job conformity, and social or emotional abilities, but that she could perform in a simple and routine job situation. See Plaintiff's Brief in Support at 7-8, 17; R. at 427-432 (Dr. Mercatoris' Evaluation Report); See also id. at 446 (noting that evidence did not establish the Listing criteria for 12.06 anxiety-related);[16] id. at 447 (Consultant's Notes - referring to notes of 5/21/04 - visit to Dr. Patel, *see* above); id. at 448 (Mental Residual Functional Capacity Assessment by Dr. Milke, indicating no or moderate limitations to understanding, concentration/persistence, social interaction and adaptation); id. at 450 (Dr. Milke's Report of September, 2004, concluding that Dr. Mercatoris' opinion was consistent with Dr. Milke's, and with other file evidence, and that Plaintiff's general anxiety and panic impairments did not preclude her from employment).

---

15. Plaintiff reported to Dr. Mercatoris that she had been recently diagnosed with anxiety by Dr. Patel, whom she'd seen twice, and that she had no other mental health counselor or treatment history, although she indicated she took unspecified "nerve pills". R. at 427.

16. Cf. 20 C.F.R. §§ 416.925-27 (providing that determination of whether particular psychological condition meets or equals requirements of a listed impairment is a medical judgment and may be made by the Commissioner's designated psychologists and consultative medical specialists).

(7) On December 28, 2004, Plaintiff began to present at another medical provider, Seneca Medical Center. She was seen once in December and again the next month, January, 2005, with complaints of headache, numbness and leg pain. Extensive medical testing during 2005 and into 2006 was all negative.

Plaintiff presented again thirteen (13) months later, in February, 2006 (and again in March, June, and September) with repeating complaints of headache, numbness, chest pain, leg pain and swelling. See id. at 6.

It appears that from March through December, 2006, Plaintiff was applying for, and possibly receiving, State disability benefits owing to her complaints of leg pain, with Certification by Seneca. See R. at 472 (Pennsylvania Employability Re-assessment Form completed by Plaintiff on 8/18/06, indicating that she "previously provided an Employability Assessment Form indicating that [she] had a temporary disability" and was now representing continued inability to work because "My legs still hurt, I can't walk very far" and providing a Medical Certification of temporary disability from September through December, 2006, owing to lower leg pain, from Seneca Medical Center). See also R. at 474 (initial Employment Assessment Form dated 5/31/06, with certification of temporary disability from March through September, 2006 by Seneca for lower leg pain).

(8) As noted above, Plaintiff's requested Hearing before the ALJ occurred in mid-October, 2006, and the record was held open for additional evidence. Plaintiff obtained a consultative psychological evaluation with Dr. Fernan in early November. See R. at 511-15 (Dr. Fernan's Consultative Report). He recounted her self-reporting as suffering from asthma, lightheadedness, aneurysm and headaches. He further reported Plaintiff's descriptions of

8

anxiety, depression, tiredness, easy irritation, social withdrawal/isolation. IQ testing administered at that time suggested Plaintiff to be cognitively impaired in several areas, with a full scale IQ of 65; Dr. Fernan diagnosed *mild* mental retardation. Plaintiff also demonstrated very/extremely poor literacy and math skills. Her personality profile indicate withdrawal, stress, social anxiety, and poor self esteem. See Plaintiff's Brief in Support at 9-10; R. at 513. Dr. Fernan noted, however, somewhat unclearly, that the profile pattern was "of somewhat questionable validity" but also that it "would be seen as being valid, with [some of the elevated scores] being the result of . . . difficulty interpreting more difficult test items." Id. at 19; R. at 513. He also noted that some tendency indicated by the profile scale elevation(s) "was not at all evidenced from her history." R. at 513-14.[17] Dr. Fernan's diagnoses included depression, mathematics, bipolar disorder, and avoidant personality disorders; mild mental retardation; asthma and brain aneurysm with severe headaches; and support group and social environment problems. His prognosis was "extremely poor" and he recommended "partial hospitalization". R. at 514.

 (9) In January, 2007, Plaintiff had an initial visit with Dr. Shapiro at Venango Internal Medicine, with complaints of the pain and numbness to the legs that were the basis of her Seneca-certified State disability applications from March through December, 2006; as well as face and neck pain. Dr. Shapiro's early records indicate that Plaintiff was a "new patient" and "very poor historian" who came in "primarily because she needs a form for her medical card

---

17. The Court notes that this portion of Dr. Fernan's report appears to mingle interpretation of her Objective Personality Assessment with Plaintiff's self-reported feelings. See id. at 513 ("[S]he feels very alienated and she would often be depressed, angry and agitated."). His Report generally contains extensive discussion of Plaintiff's self-reported history. See R. 512-516.

9

completed." R. at 526. He informed Plaintiff that he "would complete her assistance form on a temporary basis" and "[e]xplained that there [was] really nothing that [he was] aware of that would really be a reason why she would be unable to work" unless he became aware of other things in her records. Id.

She was seen at Venango during February through April, 2007, and Dr. Shapiro noted the absence of physical etiology despite her history of emergency room visits. He noted the same assertions of a brain aneurysm and complaints of leg problems Plaintiff had made to other providers, but diagnosed anxiety and depression and prescribed Celexa and Lorazepam See Plaintiff's Brief in Support at 6-7; 17 (noting six visits to this provider in 2007). Ultimately, Dr. Shapira noted that Plaintiff was failing to fill prescriptions for/take her prescribed medications, that she was "abus[ing] the emegency room system", that she had physical evidence and acknowledged incidence of domestic violence, should be treated for anxiety and depression, and take her prescriptions. He cautioned Plaintiff that he could not continue to see her absent compliance and that her "use of the emergency room [was] inappropriate." R. at 520 (Office Note of April 10, 2007).[18]

(10) Subsequent to the issuance of the ALJ's decision in this case on March 12, 2007, Plaintiff was voluntarily hospitalized at Clarion Psychiatric Center for a one-week period in mid-June, 2007, after presenting herself to the emergency room. See id. at 10. She was diagnosed

---

18. See also R. at 522 (Office Note of 3/6/07 by Dr. Shapiro's colleague, Dr. Wolbert, that Plaintiff "did not bother showing up" for the colonoscopy he ordered after one of her ER visits); id. at 524 (Dr. Wolbert's note of 2/12/07, stating that Plaintiff's claim of losing 20 lbs over past two weeks was "not evidenced by" Venango's records, and ordering colonoscopy); id. at 525 (prior note of Dr. Shapiro indicating that when Plaintiff was advised that with Access Card she should be obtaining referrals for treatment, she "felt it was discrimination and [did] not want to put up with it").

with mild "psychomotor retardation", "mood disorder", and nicotine dependence. She was prescribed Trilafon and Cogentin, and referred to Clarion's Counseling Center for outpatient counseling. See id. at 10-11; R. at 559-60.[19] The Court notes that these records also indicate that Plaintiff and her husband were on probation for welfare fraud in 1994. See R. at 560.

### C. "Substantial Evidence" Standard of Review

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner that the plaintiff failed to sustain her burden of demonstrating that she was disabled within the meaning of the Social Security Act. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g). See also, *e.g.*, Richardson v. Perales, 402 U.S. 389 (1971); Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994).

More specifically, 42 U.S.C. Section 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir.

---

19. Cf. Szubak v. Secretary of Health and Human Services, 745 F.2d 831, 833 (3d Cir. 1984) (explaining that "an implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied"). Cf. also 20 C.F.R. § 404.620(a)(2) (providing that remedy for claimant who meets disability requirements after period in which her application was in effect, *i.e.*, after the ALJ's decision, is to file a new application).

11

1000) (citing Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).  Although there may be contradictory evidence in the record, and/or although this Court may have found otherwise, it is not cause for remand or reversal of the Commissioner's decision if substantial support exists.  Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

### D.  Disability Evaluation

The issue before the Court for immediate resolution is a determination of whether or not there is substantial evidence to support the findings of the Commissioner that the plaintiff was not entitled to benefits within the meaning of the Act.

The term "disability" is defined in 42 U.S.C. Section 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

The requirements for a disability determination are provided in 42 U.S.C. Section 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence  . . . 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. Section 423(d)(3).[20]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability. The regulations, published at 20 C.F.R. §§404.1501-1529, set forth an orderly and logical sequential process for evaluating all disability claims.[21] In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity. If not, then the severity of the plaintiff's impairment must be considered. If the impairment is severe, then it must be determined whether he meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairment does not meet or equal the Listings, then it must be ascertained whether she can do her past relevant work. If not, then the residual functional capacity of the plaintiff must be ascertained, considering all the medical evidence in the file, to assess whether the plaintiff has the ability to perform other work existing in the national economy in light of

---

20. In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence. Cf. Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"). In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of daily activities. See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review discussed supra. See Good v. Weinberger, 389 F. Supp. 350, 353 (W.D. Pa. 1975) (discussing Bittel and concluding that where "plaintiff did not satisfy the fact finder in this regard, so long as proper criteria were used, [it] is not for us to question"); see also Kephart v. Richardson, 505 F.2d 1085, 1089 (3d Cir. 1976) (noting that credibility determinations of ALJ are entitled to deference).

21. This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court. See, *e.g.*, Barnhart v. Thomas, 124 S.Ct. 376, 379-80 (2003).

plaintiff's age, education and past work experience. At step five of this analysis, the burden shifts to the Commissioner. Thus, it must generally be determined whether or not there is substantial evidence in the record to support the conclusion of the Commissioner that Plaintiff was not disabled within the meaning of the Social Security Act.

While these statutory provisions may be regarded as harsh; nevertheless, they must be followed by the courts. NLRB v. Staiman Brothers, 466 F.2d 564 (3d Cir. 1972); Choratch v. Finch, 438 F.2d 342 (3d Cir. 1971); Woods v. Finch, 428 F.2d 469 (3d Cir. 1970).

### III. ANALYSIS

As discussed above, to be eligible for benefits/income under the Act, a plaintiff generally has the burden of establishing that she has a qualifyingly-severe, medically-determinable impairment during the relevant time period of her claim. See 42 U.S.C. § 405(g). See also Adorno v. Shalala, 40 F.3d 43,46 (3d Cir. 1994). And a finding of disability is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e).

In the case at hand, the ALJ's Decision indicates that he was aware of Plaintiff's history of presenting at various medical facilities for treatment with physical complaints; resulting diagnoses including a mental health component, such as anxiety and/or depression; and receipt of various prescriptions/medications. He was also aware of the marked absence in the medical records of any course of mental health treatment.[22] And he considered Plaintiff's self-reporting

---

22. See Decision at 4-6. Compare Plaintiff's Brief in Support at 18 ("The ALJ rejected Dittman because she had never had mental health treatment and was only prescribed Seroquel. To the contrary, there is medical and lay evidence of mental health treatment"); id. (providing citation only to record pages of (1) Plaintiff's September 2004 Report listing treatment dates of May 6
(continued...)

14

of her symptoms, medical treatment, and daily activities. As discussed above, despite her extensive history of intermittently presenting for treatment, Plaintiff's medical records contained comparatively little indication of any mental health professional evaluation and treatment.[23] Plaintiff asserts that because she is "in denial" regarding her mental health problems, "the lack of mental health treatment does not . . . detract from the evidence in support of her claim". Plaintiff's Brief in Support at 15. She provides no case citation for this proposition. Plaintiff generally cannot, however, in the context of requesting disability benefits, succeed in her claim absent objective medical evidence supporting her assertions of severe mental health and intellectual impairments. Rather, it is Plaintiff's burden under the law to provide record evidence supporting entitlement to the government disability benefit payments requested. Cf. *supra* at n. 14.

The ALJ was, however, able to further inform his determination by consideration of the reports of both consultative psychologists: that of Dr. Mercatoris, the Commissioner's consultant, (which incorporated an evaluation by Dr. Milke) and that of Dr. Fernan, the Plaintiff's consultant retained shortly after the Hearing. More specifically, as to Dr. Mercatoris, the ALJ noted the assessment of moderate limitations in understanding, remembering/carrying out detailed instructions, and responding to work pressures/changes, as well as Dr. Mercatoris' diagnosis of

---

22. (...continued)
and 11, 2004; (2) UPMC ER visit April 19, 2004 listing "very vague" complaints of sensations of burning and numbness, showing provisional diagnosis of anxiety and directing followup with Dr. Patel; (3) Clarion ER visit of same date noting complaints of numbness to head and diagnosis of anxiety/depression; and (4) one page note of Dr. Patel regarding Plaintiff's visit on May 21, 2004).

23. And although Plaintiff identifies a treating physician as Dr. Zajac, see, *e.g.*, Record at 336, she does not provide citation to supporting records from this physician.

anxiety disorder and impaired intellectual ability. As to Dr. Fernan, the ALJ noted that he found Plaintiff to have mild mental retardation, depressive and personality disorders, and assessed marked to extreme limitations in understanding and carrying out instructions, social interactions, and work pressures/changes. He also noted that Dr. Fernan expressed some reservations regarding Plaintiff's testing results, see discussion *supra*. The Decision does not indicate that the ALJ rejected Dr. Fernan's personality testing as invalid, see Plaintiff's Brief in Support at 19; rather, he weighed the medical opinion evidence, the supporting objective evidence, and other evidence, including Plaintiff's history and testimony, in concluding that it did not support mental health impairments of a severity that would render Plaintiff disabled from employment within the Act. The ALJ was within his discretion to so conclude. See 20 C.F.R. § 404.1512(a) (requiring claimant to "furnish medical and other evidence that [Agency] can use to reach conclusions about [claimant's] medical impairments and . . . ability to work on a sustained basis"); Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004) (noting that the claimant bears the burden of supplying adequate records and evidence to prove her claim).[24]

The Court observes that the ALJ provided a discussion of the evidence that was not as extensive as that which this Court would have undertaken in his place. That is, however, *not* the standard under which the Decision is subject to review. Rather, the question before this Court is whether "substantial evidence" supports the ALJ's finding - whether or not the Court would have reached a different result or provided a different written exposition. So long as the ALJ's

---

24. Although Plaintiff asserts that the ALJ erred in "simply declar[ing] that Plaintiff did not meet a mental health listing, without analysis, see Plaintiff's Brief in Support at 15 (item IV),16, the ALJ provides a discussion of this question in the pages of the Decision preceding the enumerated findings. See Decision.

Decision was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion", it may not be overturned. See Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1000) (citing Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999). And the Court concludes that - in light of the Decision and record as a whole, which the Court has thoroughly reviewed - the Decision meets the applicable standard of review.

## IV.	ORDER

For the reasons discussed above, the Commissioner's Decision was supported by substantial evidence. It is therefore Ordered that Plaintiff's Motion for Summary Judgment be denied, that Defendant's Motion for Summary Judgment be granted, and that the Decision of the Commissioner be affirmed.

                    LISA PUPO LENIHAN
                    United States Magistrate Judge

Dated: October 23, 2008